UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| SIMPLIVITY CORPORATION, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | 16-cv-11378-ADB |
| | * | |
| RICHARD BONDRANKO, | * | |
| | * | |
| Defendant. | * | |

**MEMORANDUM AND ORDER**

August 31, 2016

BURROUGHS, D.J.

Plaintiff SimpliVity Corporation ("SimpliVity") brings this action against its former employee, Richard Bondranko, to enforce the confidentiality and non-competition provisions of the Proprietary Information and Inventions Agreement (the "PIIA") signed by Mr. Bondranko at the start of his employment with SimpliVity. On May 31, 2016, after spending approximately a year-and-a-half as a Technical Support Manager at SimpliVity, Mr. Bondranko began working in a similar position at Nutanix, Inc. ("Nutanix"). SimpliVity alleges that Mr. Bondranko breached the PIIA by working at Nutanix, and seeks both injunctive relief and damages.

Currently pending is SimpliVity's motion for a preliminary injunction. For the reasons stated herein, the preliminary injunction is **GRANTED**. Mr. Bondranko is ordered to cease his employment with Nutanix and is enjoined from being employed by or performing services for Nutanix for six months from the date of this Order. In addition, he is ordered to (1) refrain from using or disclosing SimpliVity's Proprietary Information, as defined in the PIIA; (2) immediately identify and return all Proprietary information in his possession, custody, or control; (3) verify that (a) all Proprietary Information has been returned to SimpliVity, (b) no Proprietary

Information has been retained by him, and (c) no Proprietary Information in his possession,

custody or control has been deleted or destroyed; (4) produce a log to SimpliVity describing any

Proprietary Information previously in his possession, custody, or control that has been deleted or

destroyed since he resigned from SimpliVity; (5) preserve and not destroy any of the contents of

his personal email sent or received between May 1, 2016 and July 1, 2016, until produced in

discovery or this litigation is closed; and, (6) for six months from the date of this Order, refrain

from soliciting any person to end their employment with SimpliVity or from soliciting any

person who has worked for SimpliVity within the last six months to join Nutanix.

## I.     Factual and Procedural Background

SimpliVity is a technology start-up based in Westborough, Massachusetts that develops

and sells products aimed at simplifying IT for businesses by converging a number of

functionalities of numerous disparate products, including server, storage, IT protection and

management, into "all-in-one" products. [ECF No. 5 ("Compl.") ¶¶ 4, 9, 12]. Its products are

sold in the "hyperconverged IT infrastructure and software defined data center markets" and

have been sold to customers around the world. Id. ¶ 14.

Mr. Bondranko began working at SimpliVity on January 19, 2015 as a Technical Support

Manager. Id. ¶ 26. In this position, Mr. Bondranko managed SimpliVity's technical support

engineers. [ECF No. 34 ("Day 3 Tr.") at 41]. Working from Raleigh, North Carolina, Mr.

Bondranko oversaw the engineers who responded to and resolved technical problems that

existing customers had with SimpliVity's products. Mr. Bondranko did not have a sales role and

he generally did not interact directly with SimpliVity's customers. He does not have a technical

background and was not responsible for actually fixing customer's problems. His primary role

was to work behind the scenes to supervise SimpliVity's technical support team and coordinate SimpliVity's responses to customers' technical issues.

Occasionally, when a customer became dissatisfied with SimpliVity's technical support, the case would be "escalated," at which point Mr. Bondranko would work more closely with the customer to assess the problem and manage SimpliVity's response. Day 3 Tr. at 43. These escalated cases were the only instances in which Mr. Bondranko communicated directly with SimpliVity's customers. For some of the escalated cases, Mr. Bondranko also helped draft an incident report, a confidential document summarizing the performance issue and corrective actions taken by SimpliVity. [ECF No. 40 ("Day 2 Tr.") at 42-43]. Mr. Bondranko was also responsible for preparing "aging cases reports," which tracked technical support cases that had been open and unresolved for over a month. Day 3 Tr. at 49; Compl. ¶ 41.

All SimpliVity employees are assigned to one of seven levels of access to confidential information based on their job responsibilities. Day 2 Tr. at 17. As a technical support manager, Mr. Bondranko was assigned to the second highest level of access. Id. at 17-18. At this level, Mr. Bondranko had access to SimpliVity's password-protected Salesforce database, a customer relations management tool used by the sales department to track current customers, as well as sales leads and other salesforce information. Id. at 46.

On his first day of work at SimpliVity, as a condition of his employment, Mr. Bondranko executed the PIIA. [ECF No. 4-1]. SimpliVity requires all of its employees to enter into PIIAs. Day 2 Tr. at 58. Under the PIIA, Mr. Bondranko agreed to: (1) not disclose or use any of SimpliVity's Proprietary Information outside the scope of his employment;[1] and (2) not work for

---

[1] Proprietary Information is defined in the PIIA as "all Assigned Inventions and all other business, technical and financial information, including the identity of and information relating to [SimpliVity's] employees, Affiliates and Business Partners . . . that relate to [SimpliVity] or

a Competing Business for a period of one year immediately following termination of his

employment at SimpliVity.[2] Specifically, Mr. Bondranko agreed to "hold in confidence and not

disclose to anyone or, except within the scope of [his] employment, use any Proprietary

Information." Id. at 3. He further agreed that, for a period of one-year following termination, he

would not "directly or indirectly . . . act in Any Capacity in or with respect to any Competing

Business located within the Commonwealth of Massachusetts, the rest of the region known as

New England, the rest of the United States, or anywhere else in the world," and that he would

inform SimpliVity of the identity of his future employers. Id. at 4.

Mr. Bondranko resigned from SimpliVity on May 16, 2016. Compl. ¶ 3. He had been

looking for a new job since April, because he was concerned about his job security, and

ultimately accepted a job in the North Carolina call center of Nutanix, another technology start-

up in the hyperconvergence space. Day 3 Tr. at 36-37. On the day of his resignation, when asked

if he was going to work for a competitor, Mr. Bondranko declined to identify his new employer,

and as result, SimpliVity terminated Mr. Bondranko's employment that day, without allowing

him to stay for the two-week notice period. Day 3 Tr. at 45.

Mr. Bondranko began working at Nutanix on May 31, 2016, as Manager, Global

Technical Support. [ECF No. 11 ("Bondranko Decl.") ¶ 12]. His job is similar to one he had at

SimpliVity; he manages a team of support engineers in Nutanix's North Carolina call center,

who handle existing customers' issues with Nutanix's products. Id.

---

the business or demonstrably anticipated business of [SimpliVity], or that are received by or for
[SimpliVity] in confidence." [ECF No. 4-1 at 2].
[2] Competing Business is defined in the PIIA as "any commercial activity which competes or is
reasonably likely to compete with any business that [SimpliVity] conducts, or anticipates
conducting, at any time during my employment." [ECF No. 4-1 at 3].

SimpliVity did not confirm that Mr. Bondranko had joined Nutanix until June 28, 2016. Compl. ¶ 56. SimpliVity contends that a forensic analysis of Mr. Bondranko's SimpliVity laptop revealed that Mr. Bondranko had visited my.nutanix.com, a Nutanix portal requiring a username and password, prior to turning in his laptop on his last day of employment with SimpliVity and that he had continued to access his SimpliVity Salesforce account on multiple occasions while employed at Nutanix. Id. ¶¶ 51, 54. SimpliVity also alleges that prior to resigning, Mr. Bondranko emailed documents containing SimpliVity's Proprietary Information to his personal email account, including an aged cases presentation, which he sent to himself on May 3, 2016, after he had already contacted a recruiter. Id. ¶ 52. He also allegedly uploaded an unknown number of documents from his SimpliVity laptop to a high-capacity storage drive on May 13, 2016, and uploaded two customer incident reports to his Dropbox account on the day he resigned. Id. ¶¶ 52, 53.

In a complaint that was first brought in state court on June 30, 2016 [ECF No. 5], and removed to federal court on July 1, 2016 [ECF No. 1], SimpliVity alleges that by leaving to work for Nutanix, and taking SimpliVity's confidential information with him, Mr. Bondranko has breached the non-disclosure and non-competition provisions of the PIIA. They claim that "Bondranko's vast knowledge of SimpliVity's strengths and weaknesses, customer response history, security measures, and near-term product road map will provide Nutanix with ample basis to sow new [fear, uncertainty, and doubt] into the marketplace." Compl. ¶ 58.

SimpliVity's complaint, which seeks damages and injunctive relief, contains four counts: breach of contract (Count I); breach of the covenant of good faith and fair dealing (Count II); misappropriation of confidential information and trade secrets, under the common law (Count

III) and under Mass. Gen. L. 93 §§ 42 and 42A (Count IV). A trial has been scheduled for December 5, 2016.

Currently pending is SimpliVity's motion for a preliminary injunction, filed on July 11, 2016. [ECF No. 13]. SimpliVity has requested that the Court order Mr. Bondranko to: (1) cease his employment with Nutanix and not perform any services for Nutanix until May 15, 2017; (2) not use or disclose SimpliVity's Proprietary Information; (3) identify and return any SimpliVity Proprietary Information in his possession, custody or control; (4) immediately make available to SimpliVity all storage drives that he attached to his SimpliVity computer; (5) provide access for SimpliVity to the Dropbox account referenced in the Complaint; (6) identify the physical and/or electronic locations where all SimpliVity Proprietary Information controlled by Mr. Bondranko resided following his resignation from SimpliVity; (7) verify that (a) all SimpliVity Proprietary Information has been returned to SimpliVity, (b) no Proprietary Information has been retained by him, and (c) no SimpliVity Proprietary Information in his possession, custody or control has been deleted or destroyed; (8) produce a log to SimpliVity describing any SimpliVity Proprietary Information in Bondranko's possession, custody, or control that has been deleted or destroyed in the past sixty days; (9) preserve and not destroy the contents of his personal email account(s) and social media account; and (10) refrain from soliciting any person to end their employment with SimpliVity, or from soliciting any person who has worked for SimpliVity within the last six months to join Nutanix. Id. at 4-5.

Mr. Bondranko opposed the motion on July 13, 2016 [ECF No. 10], and the Court heard evidence and argument over the course of several days in July and August 2016. [ECF Nos. 21, 32, 33, 36, 42].

## II.    Legal Standard

"In determining whether to grant a preliminary injunction, the district court must consider: (i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013). SimpliVity, as the moving party, bears the burden of satisfying each of these elements. See Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003).

Further, the four factors "are not entitled to equal weight in the decisional calculus." Harnett, 731 F.3d at 9. Rather, the movant's likelihood of success on the merits "is the main bearing wall of the four-factor framework." Id. at 10 (internal quotations and citation omitted). In the First Circuit, "proving likelihood of success on the merits is the 'sine qua non' of a preliminary injunction." Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 794 F.3d 168, 173 (1st Cir. 2015) (quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002)). "[I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." Id. (quoting SprintCom, 287 F.3d at 9). Additionally, courts in the First Circuit "measure irreparable harm on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits . . . such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." Braintree Labs., Inc. v. Citigroup Global Mkts. Inc., 622 F.3d 36, 42-43 (1st Cir. 2010) (internal quotations and citation omitted).

### III.   Breach of the Non-Compete

####   a.   Likelihood of Success on the Merits

In this diversity case, state law provides the "substantive rules of decision" with respect to SimpliVity's contract claims against Mr. Bondranko. Harnett, 731 F.3d at 9 (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). Under Massachusetts law (which applies under section seven of the PIIA), a restrictive covenant in an employment agreement is enforceable "only if it is necessary to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public interest." Boulanger v. Dunkin' Donuts Inc., 442 Mass. 635, 639 (2004). The protection of "trade secrets, other confidential information, or . . . the good will the employer has acquired through dealings with his customers" all constitute legitimate business interests. Marine Contractors Co. v. Hurley, 365 Mass. 280, 287 (1974).

Mr. Bondranko claims that the PIIA is not enforceable under Massachusetts law because it does not protect a legitimate business interest and that SimpliVity is attempting to use the PIIA to restrain ordinary competition. SimpliVity responds that the PIIA is necessary to protect its confidential information and good will. SimpliVity further claims that as a Technical Support Manager, Mr. Bondranko had "intimate knowledge of SimpliVity's products and their performance," and that he can now "articulate SimpliVity's weaknesses [and] identify customers that required technical resolutions arising from performance issues." [ECF No. 4 at 15]. According to SimpliVity, "Bondranko's new employment—which requires him to perform similar duties at Nutanix and to communicate with similar members of the hyperconvergence ecosystem competing for the same IT spends—creates the inevitable likelihood that Bondranko will reveal confidential information that could damage SimpliVity's reputation and good will." Id. at 16.

Two years ago, in SimpliVity Corporation v. Moran, the Massachusetts Superior Court, faced with a similar PIIA, enjoined a former SimpliVity Regional Sales Director from working at Nutanix within a year of his resignation from SimpliVity. CA No. 14-2133, slip op. (Mass. Super. Ct. Aug. 14, 2014). In Moran, Justice Hogan found that the PIIA was necessary to protect SimpliVity's legitimate interest in its confidential information and good will. First, the "inside information regarding marketing, operational, sales and competitive strategies, plans for product and business development, and SimpliVity's customers and potential customers, which was shared with [defendant] and which he participated in developing," constituted confidential information that SimpliVity had a legitimate interest in protecting. Id. at 19. It was "inevitable" that the defendant would use and/or disclose the confidential information, and therefore the PIIA was necessary to safeguard it. Id. at 19-20. Second, in his sales role, the defendant "was responsible for developing business for [SimpliVity] and selling its innovative products," and he therefore had "develop[ed] SimpliVity's goodwill with new customers, potential customers and the market" that was legitimately protected under the PIIA. Id. at 20.

More recently, in SimpliVity v. Hofdahl, the Massachusetts Superior Court again considered whether to enforce SimpliVity's PIIA against a sales manager that had left SimpliVity to work for a different technology company. CA No. 16-1541, slip op. (Mass. Sup. Ct. June 23, 2016). Justice Kaplan ultimately declined to enjoin the defendant; there was no evidence that his new company competed with SimpliVity, and therefore SimpliVity was unlikely to suffer any irreparable harm. Nonetheless, before denying the injunction, he found that the PIIA protected a legitimate business interest and was enforceable under Massachusetts law. Specifically, the PIIA protected the confidential and valuable information the defendant had received while at SimpliVity "concerning the strengths and weaknesses of SimpliVity's

products, the industries in which it worked best, and the sales approaches that worked well and less well . . . ." Id. at 11. This information, Justice Kaplan found, "certainly could give [defendant] an advantage in a competition" between SimpliVity and his new company, if they were competing for the same potential customer. Id.

This is not a case, like Moran, in which the defendant regularly interacted with customers and was directly involved with sales. Mr. Bondranko generally did not communicate with customers even when they had a technical issue. He only interacted with customers after their technical support case was escalated, and even then, his interaction was limited and short-lived. Further, while it's possible that Mr. Bondranko worked with a customer more than one, Mr. Bondranko could not remember such an instance, and it would have been a rare occurrence. Accordingly, Mr. Bondranko did not develop protectable good will. Good will has been defined as "a company's positive reputation in the eyes of its customers or potential customers [and it] is generated by repeat business with existing customers or by referrals to potential customers." Corcoran, 452 Mass. 851, 869–70 (2009). To develop good will, an employee must have been "'in a position . . . to develop close relationships with a wide range of [the employer's] customers or suppliers.'" Oxford Glob. Res., Inc. v. Guerriero, No. 03-cv-12078, 2003 WL 23112398, at *7 (D. Mass. Dec. 30, 2003) (alterations in original) (quoting FLEXcon Co. v. McSherry, 123 F. Supp. 2d 42, 45 (D. Mass. 2000)). Because Mr. Bondranko primarily worked behind the scenes at SimpliVity, he was not in a position to develop the type of relationships to which good will attaches.

Nonetheless, the PIIA does protect a legitimate business interest—namely, SimpliVity's interest in protecting its confidential information. During the course of his employment at SimpliVity, Mr. Bondranko learned non-public information regarding the weaknesses in

SimpliVity's products and the customers that were unhappy with SimpliVity. Though Mr.

Bondranko did not have an intimate understanding of SimpliVity's underlying technology, and

could not fix the problems himself, he still learned about the types of problems customers were

facing, and whether they were satisfied with SimpliVity's response.

Mr. Bondranko claims that the PIIA is not necessary to protect SimpliVity's proprietary

information because (1) neither trade secrets nor confidential information are at issue here; and

(2) he will not use or disclose trade secrets or confidential information, given the nature of his

new position at Nutanix. [ECF No. 10 at 13-15]. In support, Mr. Bondranko mainly cites to

misappropriation of trade secret cases that did not involve non-competition agreements. See e.g.,

Sutra, Inc. v. Iceland Express, EHF, No. 04-cv-11360, 2008 WL 2705580, at *3 (D. Mass. July

10, 2008); Esalon, Inc. v. Hoffman, 2011 WL 7982164, at *2 (Mass. Super. July 12, 2011);

Staffbridge, Inc. v. Gary D. Nelson Assocs., Inc., 2004 WL 1429935 at *3 (Mass. Super. June

11, 2004); USM Corp. v. Marson Fastener Corp., 392 Mass. 334, 352 n.17 (1984); Bayco

Products, Inc. v. Lynch, No. 10-cv-1820, 2011 WL 1602571, at *5 (N.D. Tex. Apr. 28, 2011).

Given the existence of the PIIA and SimpliVity's breach of contract claim, Mr. Bondranko's

reliance on these cases is misplaced—the Court does not need to find a likelihood of success on

SimpliVity's misappropriation of trade secret claim in order to grant the preliminary injunction.

Further, it does not need to find that the confidential information that Mr. Bondranko had access

to qualifies as a trade secret, given that a non-competition agreement may be used to protect both

trade secrets and confidential information. Boulanger, 442 Mass. at 641 ("A covenant not to

compete is enforceable only if it is necessary to protect a legitimate business interest . . . .

Legitimate business interests include protection of trade secrets, confidential information, and

good will."); see also Get In Shape Franchise, Inc. v. TFL Fishers, LLC, No. 15-cv-12997, 2016

11

WL 951107, at *15 (D. Mass. Mar. 9, 2016) ("[T]he protection of trade secrets, other confidential information, and the good will the employer has acquired through dealings with his customers constitute legitimate business interests.") (internal quotations omitted).

The customer information that Mr. Bondranko had access to was clearly confidential. Which customers experienced difficulties with SimpliVity's products, and the nature of those difficulties, is not public information, and SimpliVity took reasonable steps to prevent its disclosure, including requiring its employees to sign the PIIA, having password-protected computers, and giving employees different levels of access, depending on their job responsibilities. This information would be of obvious value to SimpliVity's competitors, allowing them to know the strengths and weaknesses of SimpliVity's products, and which customers are dissatisfied with SimpliVity's services.

Further, SimpliVity has demonstrated that the non-compete is necessary to protect this confidential information. Just over two weeks after resigning from SimpliVity, Mr. Bondranko left to work for SimpliVity's "direct and primary competitor." Moran at 2. As Justice Hogan explained in Moran:

> Like SimpliVity, Nutanix also develops and sells converged IT infrastructure and software defined data center products in the same markets as SimpliVity. Both SimpliVity and Nutanix pursue the same target customers, pursue the same type of resellers and partners, and present a very similar set of value propositions, marketing tactics, and themes to customers. Both Nutanix and SimpliVity refer to themselves as direct competitors in their marketing materials, on blogs and through social media. Customers, partners, and the media also view and refer to SimpliVity and Nutanix as direct competitors.

Id. Because of this overlap in customers and products, the non-compete is reasonably necessary to protect SimpliVity's confidential information. It is unlikely that Mr. Bondranko could refrain from using SimpliVity's confidential information, which he knows and took with him to

Nutanix, even if he were inclined do so. See, e.g., Aspect Software, Inc. v. Barnett, 787 F. Supp. 2d 118, 130 (D. Mass. 2011) (given the similarity of his new role with competitor, "it is difficult to conceive how all of the information stored in [defendant's] memory can be set aside . . .") (internal quotations omitted); Empirix, Inc. v. Ivanov, 2011 WL 3672038, at *4 (Mass. Super. May 17, 2011) (granting preliminary injunction because a former employee's "knowledge of the competing product will inevitably and inadvertently surface during" his work for a competitor); see also Boulanger, 815 N.E.2d at 579 n. 12 ("[W]orking for a competitor of the defendant makes it likely that the information the plaintiff possesses will be used, yet it might be impossible to detect or prove.").

Accordingly, Mr. Bondranko has shown a likelihood of success on the merits. The non-competition agreement in the PIIA protects a legitimate business interest, and Mr. Bondranko has breached it by working for SimpliVity's primary competitor just two weeks after leaving SimpliVity. This is not a case in which an employer is using a non-compete merely to prevent an employee from using the skill and general knowledge acquired or improved through his employment. Rather, Mr. Bondranko acquired sensitive, non-public information while working at SimpliVity, and barring Mr. Bondranko from working for Nutanix is likely necessary to protect that information.

All this being said, the one-year limitation in the PIIA is likely greater than necessary to protect any legitimate business interest. The PIIA does not take into account the individual circumstances of each employee. Every SimpliVity employee signs the PIIA, and the terms of the PIIA are not customized for each employee. Here, taking into account Mr. Bondranko's individual circumstances—including that he did not develop good will, does not have technical expertise, and worked at SimpliVity for less than a year-and-a-half—the Court finds that the

PIIA's one-year term is unreasonable and that a six-month restriction is sufficient to protect SimpliVity's interest in safeguarding its confidential information. See Kroeger v. Stop & Shop Companies, Inc., 13 Mass. App. Ct. 310, 312 (1982) ("Rather than declining entirely to give effect to an unreasonable non-competition clause, a court may modify its terms so as to make it reasonable; i.e., onerous terms may be cut back.").

### b.   Irreparable harm

The Court also finds that SimpliVity has met its burden of demonstrating a likelihood of irreparable harm in the absence of an injunction. "'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 76 (1st Cir. 2005).

In similar cases, where companies have sought preliminary injunctions to enforce non-competition agreements, courts have found a likelihood of irreparable harm for two reasons: first, because it is so hard to quantify the injury associated with the breach of a non-competition agreement, and second, because a defendant in breach of a non-competition agreement, despite his best intentions, often cannot avoid the inevitable disclosure of confidential information. See, e.g., Harnett, 731 F.3d at 242-43 (noting that "the inevitable disclosure of confidential information presents a sufficient risk of irreparable harm to justify a preliminary injunction," and that it would be "extraordinarily difficult, if not impossible, to quantify this potential harm in dollars" of a breach); Lombard Med. Techs., Inc. v. Johannessen, 729 F. Supp. 2d 432, 442 (D. Mass. 2010) (finding threat of irreparable harm from inevitable disclosure even where defendant "fully intended to protect [plaintiff's] confidential information"); New England Circuit Sale v. Randall, No. 96-cv-10840, 1996 WL 1171929, at *1 (D. Mass. June 4, 1996) ("If confidential

information is allowed to be revealed, the damage will have already occurred. There is no way to assess the amount of loss that the plaintiff will sustain due to the dissemination of highly confidential material."); Marcam Corp. v. Orchard, 885 F. Supp. 294, 297 (D. Mass. 1995) ("[T]he harm to the plaintiff cannot be avoided simply by the former employee's intention not to disclose confidential information, or even by his scrupulous efforts to avoid disclosure. . . . [I]t is difficult to conceive how all of the information stored in [defendant's] memory can be set aside as he applies himself to a competitor's business and its products."); see also Kroeger, 13 Mass. App. Ct. at 322 (noting that "the task of quantifying the consequences of violating a non-competition clause is a particularly difficult and elusive one"). In Moran, Justice Hogan found irreparable harm for both of these reasons. She determined that "the harm that SimpliVity w[ould] suffer by the use of its confidential information by a direct competitor, Nutanix, and its loss of good will is not easily measured and would therefore be irreparable" and also that "even with his best efforts, [the defendant would] inevitably use the SimpliVity confidential information in his brain and memory in selling Nutanix's products and competing against SimpliVity."

Given the value of the confidential information retained by Mr. Bondranko, the similarities of his new and old positions, and the overlap between Nutanix and SimpliVity's products and customers, these same two factors are present here. Waiting to assess damages until after a trial on the merits would be exceedingly difficult, and, despite Mr. Bondranko's best intentions, the Court is concerned that dissemination cannot be avoided.

Furthermore, SimpliVity's burden of showing irreparable harm is closely linked to its likelihood of success on the merits of its claim. See Braintree Labs., 622 F.3d at 42- 43. SimpliVity has shown a strong likelihood of prevailing on its claim that Mr. Bondranko is

violating the PIIA's restrictive covenant by working for Nutanix, and "declin[ing] to enforce the covenant while the litigation work[s] its stately course" would deprive SimpliVity of much of the covenant's protection. <u>Zona Corp. v. McKinnon</u>, 2011 WL 1663094, at \*2 (Mass. Super. Mar. 14, 2011); <u>see also</u> <u>New England Circuit Sale</u>, 1996 WL 1171929, at \*1 ("[I]f a preliminary injunction is not granted, enforcement of the non-competition clause will be circumvented.").

### c. Balance of Hardships

The Court finds that the balance of relative hardships also favors SimpliVity. Although the Court is not enthusiastic about enforcing a restrictive covenant against Mr. Bondranko—the sole provider for his family—the Court is enforcing it only against SimpliVity's primary competitor, and for a limited period of time. In the past, Mr. Bondranko has worked for technology companies outside of the hyperconvergence market, and given his general background in technical support and his past record of consistent employment, the Court finds that enforcing the covenant for a limited period of time is unlikely to prevent Mr. Bondranko from earning a living. The challenge of finding new employment is outweighed by the likelihood of harm to SimpliVity if an injunction does not issue, as discussed *supra*.

### d. Effect on the Public Interest

Finally, the Court finds that the public interest favors injunctive relief in this case. Generally, "the public interest is served by enforcing contractual obligations, including reasonable restrictive covenants, between consenting parties." <u>Iron Mountain Info. Mgmt., Inc. v. Viewpointe Archive Servs., LLC</u>, 707 F. Supp. 2d 92, 112 (D. Mass. 2010). The facts presented in this case do not warrant deviation from this general rule. Mr. Bondranko was aware of the non-competition provision in the PIIA when he left to work for Nutanix, and he knowingly chose to assume the risk of going to work for SimpliVity's primary competitor, after an abbreviated job

16

search. Accordingly, the Court finds that granting injunctive relief is not contrary to the public interest in this case.

**IV.     Disclosure of Confidential Information**

SimpliVity also seeks a preliminary injunction to enforce the non-disclosure provisions of the PIIA. They claim that Mr. Bondranko stole certain confidential information over the course of his final few weeks at SimpliVity and request an order requiring Mr. Bondranko to return the information and provide access to his storage devices for inspection. In support, they have submitted the affidavits of Michael Perry [ECF No. 5 at 272] and Jason H. Eaddy [ECF No. 26], two computer scientists that performed forensic analyses of the electronics used by Mr. Bondranko during and after his employment with SimpliVity. Mr. Bondranko has submitted the affidavit of David Knutson [ECF No. 31], another computer scientist who reviewed the data theft allegations against Mr. Bondranko.

SimpliVity has not met its burden of showing that Mr. Bondranko is likely in breach of the non-disclosure provisions of the PIIA. The two affidavits submitted by SimpliVity demonstrate that during his last few weeks at SimpliVity, Mr. Bondranko accessed storage devices from work, including a Dropbox and a USB device. SimpliVity has presented no evidence, however, as to what, if anything, was transferred to these devices. Mr. Bondranko claims that he used a USB device on his last day to transfer videos of his son playing hockey, and SimpliVity has not been able to rebut this assertion. SimpliVity also presents unsubstantiated evidence that Mr. Bondranko briefly accessed SimpliVity's salesforce database after leaving SimpliVity. Even if Mr. Bondranko did somehow access the database after resigning, there is no evidence as to what, if anything, Mr. Bondranko took from the database. Moreover, SimpliVity could have locked down access to the database immediately after Mr. Bondranko resigned but

apparently did not find a compelling need to so. Finally, SimpliVity presents evidence of a single document—"Aged Case Report 042916.xls"—that Mr. Bondranko emailed to his personal email address in his last few weeks of work. Mr. Bondranko sent this email on May 3, 2016, two weeks before he resigned, and there is insufficient evidence to show that this was done outside the course of ordinary business.

Given this very limited evidence of data theft, the Court will not order the complete injunctive relief proposed by SimpliVity, as it relates to the non-disclosure provisions of the PIIA. The Court will enjoin Mr. Bondranko from using or disclosing SimpliVity's Proprietary Information, as defined in the PIIA, and order him to (1) immediately identify and return all Proprietary information in his possession, custody, or control; (2) verify that (a) all Proprietary Information has been returned to SimpliVity, (b) no Proprietary Information has been retained by him, and (c) no Proprietary Information in his possession, custody or control has been deleted or destroyed; (3) produce a log to SimpliVity describing any Proprietary Information previously in his possession, custody, or control that has been deleted or destroyed since he resigned from SimpliVity; (4) preserve and not destroy any of the contents of his personal email sent or received between May 1, 2016 and July 1, 2016, until produced in discovery or this litigation is closed; and, (5) for six months from the date of this Order, refrain from soliciting any person to end their employment with SimpliVity or from soliciting any person who has worked for SimpliVity within the last six months to join Nutanix. The remaining provisions in the proposed order, such as requiring Mr. Bondranko to provide SimpliVity his storage devices and access to his Dropbox, are denied.

**V.     Conclusion**

For the reasons stated herein, SimpliVity's motion for a preliminary injunction [ECF No. 3] is hereby <u>GRANTED</u>. Mr. Bondranko is ordered to cease his employment with Nutanix and is enjoined from being employed by or performing services for Nutanix for six months from the date of this Order. In addition, he is ordered to (1) refrain from using or disclosing SimpliVity's Proprietary Information, as defined in the PIIA; (2) immediately identify and return all Proprietary information in his possession, custody, or control; (3) verify that (a) all Proprietary Information has been returned to SimpliVity, (b) no Proprietary Information has been retained by him, and (c) no Proprietary Information in his possession, custody or control has been deleted or destroyed; (4) produce a log to SimpliVity describing any Proprietary Information previously in his possession, custody, or control that has been deleted or destroyed since he resigned from SimpliVity; (5) preserve and not destroy any of the contents of his personal email sent or received between May 1, 2016 and July 1, 2016, until produced in discovery or this litigation is closed; and, (6) for six months from the date of this Order, refrain from soliciting any person to end their employment with SimpliVity or from soliciting any person who has worked for SimpliVity within the last six months to join Nutanix.

Mr. Bondranko's Motion for an Order that Plaintiff Identify the Purported Trade Secrets and Confidential Information at Issue in This Action [ECF No. 12] remains unopposed. At a previous court appearance, the parties disputed whether the motion has been mooted. By Friday, September 2, the parties should notify the Court as to the status of the motion, and whether it will be withdrawn, amended, or opposed.

**So ordered.**

Dated: August 31, 2016

/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT COURT JUDGE